# In the United States Court of Federal Claims

|  |  |  |
|---|---|---|
| MCDONOUGH FAMILY LAND, LP, and INGERSOLL RANCH, FLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 20-368L<br>(Filed: July 12, 2024) |
| Plaintiffs, | | |
| v. | | |
| THE UNITED STATES OF AMERICA, | | |
| Defendant. | | |

Quentin M. Rhoades, Rhoades & Erikson PLLC, Missoula, MT, for Plaintiffs. Robert Erikson, Rhoades & Erikson PLLC, Missoula, MT, Of Counsel.

Shaun M. Pettigrew, Senior Trial Attorney, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, with whom was Todd Kim, Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Chief Judge.**

Plaintiffs, McDonough Family Land, LP, and the Ingersoll Ranch, FLP ("the Ranches"), are limited partnerships that own real and personal property in Wolf Creek, Montana. See Am. Compl. ¶¶ 4, 6, ECF No. 36. The Ranches seek compensation for what they allege were Fifth Amendment takings of their properties that occurred when an Incident Management Team under the command of an employee of the United States Forest Service ("Forest Service") directed ignition of backfires and burnouts on their land in an effort to stop the further spread of the 2017 Alice Creek Fire. See Am. Compl. ¶ 1.

Currently before the Court is the government's motion for summary judgment on all claims pursuant to RCFC 56(a). Def.'s Mot. for Summ. J. at 1, ECF No. 46 [hereinafter Def.'s Mot.]. The government contends that it is entitled to judgment as a matter of law on the grounds that: (1) the United States is not liable for any taking of the Ranches' property because the firing operations took place on private lands over which the State of Montana has ultimate jurisdiction; (2) the Ranches' claims sound in tort, rather than takings; and (3) the Ranches have not produced evidence sufficient to meet their burden of proving causation. See id. at 8–9.

For the reasons set forth below, the Court concludes that each of these arguments lacks merit. The government's motion is therefore denied.

**BACKGROUND**[1]

I.  **Relevant Facts**

This case arises out of firefighting efforts undertaken in response to the Alice Creek Fire, which started in July 2017 after a lightning strike within the Helena-Lewis & Clark National Forest. Am. Compl. ¶ 11; Def.'s Mot. Ex. 1, at 2, ECF No. 46-1 [hereinafter Executive Summary]. Despite the Forest Service's initial efforts to manage the wildfire, it slowly grew in size and complexity over the next several weeks. See Exec. Summ. at 2. By August 23, the fire was still contained to national forest lands, but firefighters predicted that—due to "Critical Fire Weather Conditions"—it would likely spread onto state and private lands within 48 hours. See Def.'s Mot. Ex. 2, at 2–4, ECF No. 46-2; Def.'s Mot., Ex. 26, ¶ 9, ECF No. 46-26 [hereinafter Avey Decl.].

The wildfire management effort that followed was governed by the January 2017 "Montana Cooperative Wildland Fire Management and Stafford Act Response Agreement." See Def.'s Mot. Ex. 9, ECF No. 46-9 [hereinafter Mont. Fire Agreement]. The signatories to that Agreement were the State of Montana, the Northern Region of the Forest Service, and the regional offices of four agencies within the U.S. Department of the Interior (i.e., the Bureau of Land Management, the National Park Service, the Bureau of Indian Affairs, and the United States Fish and Wildlife Service). Id. The Agreement authorized each party to "provide fire protection services on lands under the jurisdiction of another [party]," either upon request, consistent with a cooperative agreement, or "on its own initiative" if a fire otherwise outside of that party's jurisdiction presented "an imminent threat to lands under [its] protection responsibility." See id. at 12, 14.

The parties to the Agreement also committed, among other things, to managing wildland fires under "a comprehensive, national approach" to incident management, known as the National Incident Management System ("NIMS"). See id. at 5, 10; Burns Rep. at 3. "[A]pplicable at all jurisdictional levels and across functional disciplines," NIMS provides for Incident Management Teams ("IMTs") to be assigned to manage the most complex wildfires. See Burns Rep. at 3–4. To enlist the services of an IMT, the State and the federal agencies must request one from an interagency dispatch center and execute a Delegation of Authority, "transfer[ring] authority [to] manage actions on an incident" to an IMT's Incident Commander. See Mont. Fire Agreement at 9–10, 16. When dispatched in response to a wildfire, team members assume supervision over its management. This includes management of both the resources assigned (e.g., hand crews, engines, and heavy equipment) and the firefighting strategies and tactics implemented on the ground. See Def.'s Mot. Ex. 27, ¶¶ 3–4 ECF No. 46-27 [hereinafter Bird Decl.]; Burns Rep. at 12–13.

When the Alice Creek Fire grew significantly at the end of August as predicted, it became clear to local fire managers that an IMT's enhanced expertise, resources, and equipment were needed to respond to the emergency. See Exec. Summ. at 2; Def.'s Mot. Ex. 2, at 1. As a result, on August 24, the Forest Supervisor for the Helena-Lewis & Clark National Forest, the Montana Department of Natural Resources & Conservation ("MT-DNRC"), and a representative

---

[1] The facts in this section are based on the parties' pleadings and the exhibits submitted in connection with the government's motion for summary judgment. Unless specifically noted, the facts set forth are not in dispute.

of Lewis & Clark County requested a Type 2 IMT to take over the response to the wildfire. See Exec. Summ. at 2; Def.'s Mot. Ex. 2, at 1. Three days later, the Forest Service and MT-DNRC delegated the authority for management of the fire to Russell Bird, a long-time fire manager for the Forest Service, who served as the Incident Commander for the Great Basin IMT5. See Exec. Summ. at 2; Def.'s Mot. Ex. 7, at 1, ECF No. 46-7 [hereinafter DOA]; Bird Decl. at 1–2.[2]

On August 28, Mr. Bird and the Great Basin IMT5 assumed command of the fire. Exec. Summ. at 2. As the Incident Commander, Mr. Bird was "responsible for all incident activities, including the development of strategies and tactics and the ordering and release of resources." Mont. Fire Agreement at 24. In this role, he also had "overall authority and responsibility for managing and conducting incident operations." Id.[3]

Around the time Mr. Bird and his IMT assumed authority for managing the wildfire, it crossed the Continental Divide, spreading onto private lands east of the Helena-Lewis & Clark National Forest. See Avey Decl. ¶ 9. From September 2–6 and on September 9, the IMT, under his leadership, directed firefighters to intentionally light "backfires and burnouts" (characterized as "firing operations") in the Helena-Lewis & Clark National Forest and on other federally- and privately-owned lands. Am. Compl. ¶ 12; Am. Answer ¶ 12, ECF No. 39.[4]

The Ranches allege that during the firing operations the IMT "intentionally ignit[ed] and burn[ed] large tracts of private range and timber, including that belonging to the Ranches." See Am. Compl. ¶ 12; see also id. at ¶¶ 14–15 (alleging that the Forest Service "took timber and range vegetation owned by and located on the Ranches by intentionally lighting the inflammable materials to fuel its backfiring and burnout operations"). They further allege that "[b]ut for [the Forest Service's] intentional ignition of the Ranches' property to fuel its burnout and backfiring operations in late August 2017, and early September 2017, the property owned by the Ranches would not have burned, and fire damage to their lands, if any, would have been de minimis." Id. at ¶ 16.[5]

---

[2] The record does not reveal what position Mr. Bird held with the Forest Service in September 2017. It does reflect that at the time of his retirement from the Forest Service in 2019, Mr. Bird was the Fire Management Officer for the Humboldt-Toiyabe National Forest in Nevada. See Bird Decl. ¶ 1.

[3] See also FOREST SERV. MANUAL § 5130.47 (2020), https://www.fs.usda.gov/about-agency/regulations-policies/manual/5130-wildfire-response (describing the responsibilities of an Incident Commander during wildfire response activities).

[4] The purpose of the firing operations was "to protect structures, ensure firefighter safety, limit the spread of the fire, and create control lines." See Am. Answer ¶ 12.

[5] The Ranches also alleged in their Amended Complaint that the reason the Forest Service did not suppress the Alice Creek Fire while it burned on national forest lands was because it "intended to use and did use the [wildfire] to achieve overall forest management goals." Am. Compl. ¶ 13; see also Pls.' Post-Disc. Conf. Mem. at 1–2, ECF No. 43 (claiming "the fire [was used] to accomplish hazardous fuel reduction goals."). The Court considers that claim abandoned because the Ranches have not responded to the government's argument that there is no evidentiary support for it. See RCFC 56(e) (providing that when a party "fails to properly

3

## II.     Procedural History

The Ranches filed their initial complaint on March 31, 2020. ECF No. 1. The government filed its answer on June 1, 2020. ECF No. 5. On March 31, 2021, the Ranches moved for summary judgment on liability and on the government's affirmative defenses. ECF No. 11. The government cross-moved in response for an order pursuant to RCFC 56(d)(1) allowing the United States an opportunity to complete discovery. ECF No. 12. The Court denied the Ranches' motion for summary judgment and granted the government's motion for an order allowing the completion of discovery. ECF No. 20.

With the leave of the Court, ECF No. 38, the Ranches filed an amended complaint on June 20, 2022, ECF No. 36, and the government filed its amended answer shortly thereafter, ECF No. 39. On October 10, 2023, after the period for discovery on liability ended, the government filed the motion currently before the Court. ECF No. 46. The parties fully briefed the motion on December 22, 2023, ECF No. 51, and the Court held oral argument on June 24, 2024, ECF No. 53.

## DISCUSSION

### I.     Jurisdiction

Under the Tucker Act, this Court has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), but it does not confer any substantive rights on a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property" shall not be "taken for public use, without just compensation." U.S. Const. amend. V. Its purpose is to prevent the government "from forcing some people alone to bear public burdens, which in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). Because the Takings Clause supplies a substantive right to money damages, claims for compensation under the Clause are within the court's Tucker Act jurisdiction. Preseault v. Interstate Comm. Comm'n, 494 U.S. 1, 12 (1990); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005).

### II.     Summary Judgment Standard

Summary judgment may be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); see also Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is "material" if it "might affect the

---

address another's party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion).

4

outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. And a dispute is "genuine" if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). All evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

The moving party "may discharge its burden [of establishing entitlement to summary judgment] by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Liberty Lobby, 477 U.S. at 248). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power, 16 F.3d at 1202.

### III. Merits

In this case, the Ranches allege that the firing operations that the IMT directed be conducted on their land in response to the Alice Creek Fire resulted in a compensable taking of their property interests in range vegetation and timber. See Am. Compl. ¶ 12. As noted above, the government argues that it is entitled to summary judgment as to the Ranches' claim for three independent reasons. For the following reasons, the Court finds each of the government's arguments unpersuasive.

#### A. **Federal Action**

The government's first argument is that the United States was not responsible for any taking of the Ranches' property because it was the State of Montana, acting through its Department of Natural Resources and Conservation, that delegated to the IMT the authority to engage in firefighting activities on private land that was otherwise within the State's jurisdiction. See Def.'s Mot. at 8–17. The government's focus on Montana's status as the jurisdictional agency is misplaced.

Under the Fifth Amendment, the United States may be held liable for a taking where the alleged invasion of property rights is attributable to an action by the federal government. Cf. Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 127 n.16 (1973) (quoting Hooe v. United States, 218 U.S. 322, 336 (1910)). An action is attributable to the federal government, and potentially compensable under the Takings Clause, if it is authorized "either directly by Congress or by the official upon whom Congress conferred the power." See United States v. N. Am. Transp. & Trading Co., 253 U.S. 330, 333 (1920); see also NBH Land Co. v. United States, 576 F.2d 317, 319 (Ct. Cl. 1978); A-1 Cigarette Vending, Inc. v. United States, 49 Fed. Cl. 345, 351 (2001) (holding the United States may be held liable for a taking only if "Congress or [an official appointed by Congress]" duly authorized the "officials responsible for causing the taking . . . to effectuate [it]").

5

There is no remedy under the Takings Clause when a federal agent's actions are ultra vires—i.e., "explicitly prohibited" by Congress or "outside the normal scope of" their official duties. See Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1363 (Fed. Cir. 1998). Nor is the federal government "liable for damages resulting from . . . acts performed by [a separate sovereign] in its sovereign capacity." Custom Contemp. Homes, Inc. v. United States, 5 Cl. Ct. 88, 90 (1984) (citing Griggs v. Allegheny Cnty., 369 U.S. 84, 89 (1962)); see also D. R. Smalley & Sons, Inc. v. United States, 372 F.2d 505, 507 (Ct. Cl. 1967) ("The United States cannot be held liable if private property is taken by the action of a State or local government entity." (citing Horowitz v. United States, 267 U.S. 458, 461 (1925); Jones v. United States, 1 Ct. Cl. 383 (1865))).[6]

A federal agent acts within the scope of their official duties when "their actions are a 'natural consequence of Congressionally approved measures,' or are pursuant to 'the good faith implementation of a Congressional Act.'" Del-Rio Drilling, 146 F.3d at 1362 (citations omitted) (first quoting NBH Land Co., 576 F.2d at 319; and then quoting S. Cal. Fin. Corp. v. United States, 634 F.2d 521, 525 (Ct. Cl. 1980)). The record before the Court on summary judgment, read in the light most favorable to the Ranches, appears to show that Incident Commander Russell Bird was acting within the scope of his official duties as an employee of the Forest Service when he directed the firing operations at issue in this case. The government therefore is not entitled to judgment as a matter of law as to its federal action argument.

By statute, it is the responsibility of the Forest Service to protect national forest lands against destruction by fire. See 16 U.S.C. § 551. Because fires do not respect boundaries between federal, state, and private land, Congress has given the Forest Service the authority to enter agreements with state and local entities that possess jurisdiction over fires that occur on adjacent non-federal property. See Reciprocal Fire Protection Act of May 27, 1955 ("RFPA"), 42 U.S.C. § 1856a(a) (stating that "[e]ach agency head charged with the duty of providing fire protection for any property of the United States is authorized to enter into a reciprocal agreement, with any fire organization maintaining fire protection facilities in the vicinity of such property, for mutual aid in furnishing fire protection for such property and for other property for which such organization normally provides fire protection" ).

The Forest Service and the other federal signatories entered the Montana Fire Agreement pursuant to their authority under RFPA, as well as a number of other federal statutes related to emergency management and homeland security. See Mont. Fire Agreement at 4 (citing authorizing federal statutes). As noted above, that Agreement, in turn, bound both the state and federal agencies to manage wildfires in accordance with the standardized approach to incident management that the federal government developed and prescribed in NIMS. See Mont. Fire

---

[6] See also Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004) (explaining that the court may only consider the actions of the federal government and its agents when evaluating Fifth Amendment takings claims); Berry v. United States, 159 Fed. Cl. 844, 848 (2022) ("[T]he actor in a Fifth Amendment takings claim against the United States must be the United States." (quoting L & W Constr. LLC v. United States, 148 Fed. Cl. 417, 424 (2020)); cf. B & G Enters., Ltd. v. United States, 220 F.3d 1318, 1323–25 (Fed. Cir. 2000) (distinguishing takings by state governments from takings by state governments acting under federal authority or as agents of the United States); D. R. Smalley & Sons, 372 F.2d at 507 (citing Horowitz, 267 U.S. at 461; Jones, 1 Ct. Cl. at 383).

Agreement at 10. As also described above, it required the federal and state agencies to enter a Delegation of Authority "to transfer authority and manage actions on an incident from the Agency Administrator to the Incident Commander." Id. at 16. And in this case, Russell Bird, an employee of the United States Forest Service, served as Incident Commander for the IMT that was summoned to manage the fire. See Bird Decl. ¶ 7.

In its motion, the government does not suggest or produce any evidence to show that anyone other than Mr. Bird was ultimately responsible for issuing the directions to undertake the firing operations about which the Ranches complain. Further, the government does not appear to deny that Mr. Bird was acting within the scope of his official duties when he directed those operations in his capacity as Incident Commander. Indeed, there is a direct line between the federal statute that authorizes the Forest Service to enter reciprocal firefighting agreements with state and local governments, and the delegation of authority to Mr. Bird to manage the Alice Creek Fire.

The government nonetheless contends that the United States cannot be held liable for a taking arising out of the firing operations because the State of Montana is the "jurisdictional agency" (i.e., "[t]he agency having land and/or resource management responsibility as provided by federal, state, or local law"). Mont. Fire Agreement at 8. It observes that Mr. Bird needed the consent—or authorization—of the MT-DNRC (as the jurisdictional agency) to take any actions to fight the Alice Creek fire on the Ranches' land. See Def.'s Mot. at 13–14. Therefore, according to the government, the actions the IMT took could not have been undertaken pursuant to federal authority. Id. at 15–16. Rather, it suggests that if the Ranches have a remedy, it would be against the State of Montana. Id. at 16.

This argument lacks merit. The State of Montana did not take or direct the actions that are alleged to have constituted a taking; the IMT, acting under the command of Mr. Bird did so. The fact that MT-DNRC gave Incident Commander Bird permission to fight the fire on non-federal property is not dispositive of whether the actions the IMT ultimately took were actions attributable to the federal government. See id. at 16. The Court infers from the record that serving as an Incident Commander was one of the duties the Forest Service assigned to Mr. Bird. See Bird Decl. ¶ 1 (stating that he served as an incident commander for "3 fire seasons"). And the government's assertions of fact, read in a light most favorable to the Ranches, suggest that the MT-DNRC played a relatively passive role in the operations about which the Ranches complain, while Mr. Bird and other federal officials took the lead. See Def.'s Mot. at 15 (observing only that "[f]ollowing execution of the delegation of authority, representatives from MT-DNRC remained in daily contact with the Great Basin IMT5 to discuss 'proposed plans and actions, success of those actions, and adjustments if needed'"); see also Def.'s Mot. Ex. 28, ¶ 10, ECF No. 46-28 [hereinafter Richards Decl.]; Bird Decl. ¶ 9.

It may be that state officials played a more active role in the operations at issue than the present record reveals, or that other facts would suggest a more passive role for the federal government. In any event, at this juncture, the Court is not persuaded that the undisputed facts in the record on summary judgment show that the federal government, acting through its agent, Incident Commander Bird, lacked sufficient involvement in the firing operations to hold it liable for a Fifth Amendment taking. It therefore denies the government's motion for summary judgment as to the federal action issue.

B.     **The Appropriation of the Ranches' Timber and Forage Was a Taking**

The government's second contention is that even assuming that the Ranches could establish the federal action required to support a takings claim, "actions taken by firefighters in response to a single wildfire" represented an "isolated physical invasion" that "is properly assessed as a trespass rather than an appropriation of a property right." See Def.'s Mot. at 8–9, 17–20. Therefore, according to the government, the Ranches' claims sound in tort, and are outside of this Court's jurisdiction. See 28 U.S.C. § 1491(a) (providing that the Court of Federal Claims "ha[s] jurisdiction to render judgment upon any claim against the United States . . . not sounding in tort").

The government's contentions lack merit. The Ranches have alleged a per se or "categorical" taking of their "range forage and standing timber (both merchantable and pre-merchantable)" by physical appropriation. Def.'s Mot. Ex. 21, at 1, ECF No. 46-21; see also Am. Compl. ¶¶ 17–35. Moreover, as the government concedes, the IMT set fire to their forage and standing timber to contain and prevent the further spread of the Alice Creek Fire. See Am. Answer ¶ 12 ("The United States avers that the only purposes for using firing and burnout operations on the Alice Creek Fire . . . were to protect structures, ensure firefighter safety, limit the spread of the fire, and create control lines."). As the Supreme Court has repeatedly held, "[w]hen the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." Cedar Point Nursery v. Hassid, 594 U.S. 139, 147 (2021) (citing Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 321 (2002)). Indeed, the physical appropriation of property by the government is the "paradigmatic" example of a compensable taking. Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005); see also Horne v. Dep't of Agric., 576 U.S. 350, 360–61 (2015) ("[P]eople still do not expect their property, real or personal, to be actually occupied or taken away."). It is also "perhaps the most serious form of invasion of an owner's property interests,'" as it "depriv[es] the owner of the 'the rights to possess, use and dispose of' the property." Horne, 576 U.S. at 360 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982)); see also Ideker Farms, Inc. v. United States, 71 F.4th 964, 978 (Fed. Cir. 2023) (holding that where "the government 'physically acquires private property,' . . . there is a physical taking to which a per se rule applies" (quoting Cedar Point, 594 U.S. at 147)).

The government responds that the burning of the Ranches' forage and timber was not a per se or categorical taking because—under Montana law—"trees and shrubs growing on land" are real property, not "personal property separate from the land on which [they] are growing." See Def.'s Reply to Pls.' Resp. to Def.'s Mot. for Summ. J. at 14–15, ECF No. 51 [hereinafter Def.'s Reply] (citing Mont. Code Ann. §§ 70-15-101(1)–(2); 70-1-106(1)–(2)). Therefore, according to the government, the Ranches are asserting a mere "injury to their real property" rather than an appropriation amounting to a taking. Id. at 14.

This argument is also unavailing. The firing operations resulted in the "appropriation" of the Ranches' timber and range forage (i.e., in the government taking the property and using it for public purposes) regardless of whether they are considered real or personal property under state law. See Cedar Point, 594 U.S. at 158 (observing that "[i]n 'ordinary English' 'appropriation' means 'taking as one's own'" (quoting 1 OXFORD ENGLISH DICTIONARY 587 (2d ed. 1989))). Moreover, under state law, the Ranches' property interest in their timber and forage can be separated from their interest in the real property as a whole. See R.M. Cobban Realty Co. v. Donlan, 149 P. 484, 487 (Mont. 1915) (observing that owners of realty may "carve out" and

8

convey "an estate in timber" by deed); cf. Hollensteiner v. Missoula Lumber Co., 96 P. 420, 422–23 (Mont. 1908) (enforcing the terms of a conveyance of timber by deed). And as the Supreme Court observed in Tahoe–Sierra, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." 535 U.S. at 321–22 (citing United States v. Pewee Coal Co., 341 U.S. 114, 115 (1951)).

The government further contends that the appropriation of the Ranches' forage and timber was not a taking under the two-part test for distinguishing torts from takings described in Ridge Line v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (observing that "not every 'invasion' of private property resulting from government activity amounts to an appropriation" and that "[t]he line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry"). This contention is also unpersuasive.

Under part one of Ridge Line's two-part inquiry, "a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" Id. (quoting Columbia Basin Orchard v. United States, 132 F. Supp. 707, 709 (Ct. Cl. 1955)). This aspect of the Ridge Line inquiry is satisfied in this case because there can be no dispute that the government intended to invade the Ranches' property interests when IMT firefighters, acting under the direction of a Forest Service employee, deliberately set their timber and range forage on fire.

Part two of the Ridge Line inquiry has similarly been satisfied. It requires consideration of the "nature and magnitude" of the government's action. See id. at 1356. To constitute a taking under part two, an invasion must "appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner['s] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Id. In this case, when Incident Commander Bird directed firefighters to burn the Ranches' timber and range forage as fuel to stop the further spread of the Alice Creek fire, that action "appropriate[d] a benefit to the government at the expense of the [Ranches]." See id.

Notwithstanding the foregoing, the government contends that treating the appropriation of the Ranches' forage and timber as a taking rather than a tort is inconsistent with the court of appeals' decision in Cary v. United States, 552 F.3d 1373 (Fed. Cir. 2009). But the claims in Cary bear little, if any, resemblance to those the Ranches pursue here. There, the plaintiffs owned land surrounded by the Cleveland National Forest, near San Diego, California. Id. at 1375. That land was consumed by a wildfire that started on national forest lands. Id. The wildfire started after a signal fire lit by a hunter lost in the forest quickly spread to adjacent property, becoming one of the deadliest and most destructive "conflagrations in California history." Id.

Seeking compensation for the loss of the value of their properties, the plaintiffs filed suit against the Forest Service under the Fifth Amendment's Takings Clause. Id. at 1376. They contended that the Forest Service's fire suppression and management policies for the Cleveland National Forest had created conditions under which a fire on national forest lands, "if not immediately controlled, would become a devastating firestorm" that would cross over onto their properties. Id. at 1375. They further argued that by "taking the known calculated risk that its land management policies in the [Cleveland National Forest] would result in a taking of adjacent

landowners' property," the United States "took their property by inverse condemnation without just compensation." Id.

The court of appeals concluded that the plaintiffs' claims satisfied neither part of the Ridge Line inquiry and thus sounded in tort. Id. at 1379–80. First, with respect to part one (i.e., the causation prong), the plaintiffs in Cary, unlike the Ranches here, could not and did not contend that the government "intend[ed] to invade a protected property interest" when it adopted the fire suppression policies that the plaintiffs challenged. Id. at 1377 (observing that "the government did not intend to take the landowners' land by use of an uncontrolled wildfire and [plaintiffs] do not allege that they did"). Instead, as noted, their argument (which the court of appeals rejected) was that the wildfire that burnt their property was "the direct, natural, or probable result" of the Forest Service's fire suppression and management policies. Id.

The court of appeals in Cary also determined that the plaintiffs failed to satisfy part two of the Ridge Line inquiry (i.e., the appropriation prong). Id. at 1380. The court noted first that the plaintiffs did not plead, nor could the court identify, any benefit that the wildfire appropriated to the government at the expense of the property owners. Id. And second, the court held that it could not conclude from the allegations in the complaint that the plaintiffs' rights to enjoy their property had been preempted for an extended period of time. Id. at 1380–81. To the contrary, the court of appeals opined, "the fire has come and gone, and there is no allegation that the injuries prevent future use of the land, or that the fire will intermittently but inevitably recur." Id. at 1381.

The government contends here that—like the plaintiffs in Cary—the Ranches "assert only a single isolated physical invasion during the response to the Alice Creek Fire" and argues that the Ranches therefore have failed to show that their rights to enjoy their property were preempted for an extended period of time. Def.'s Reply at 17; see also Def.'s Mot. at 20. But the government's argument ignores that the Ranches can satisfy part two of the Ridge Line inquiry by showing that the firing operations conducted by the IMT "appropriate[d] a benefit to the government at the[ir] expense" or preempted their "right to enjoy [their] property for an extended period of time." 346 F.3d at 1356.

In this case, the fact that the fires the IMT set in response to the Alice Creek Fire eventually stopped burning is beside the point. As the Court concluded above, part two of the Ridge Line inquiry is satisfied here because the government benefited from the use of the Ranches' timber and range forage as fuel for the firing operations conducted by the IMT. Furthermore, and in any event, the "property" the Ranches allege has been taken in this case is their timber and range forage. Def.'s Mot. Ex. 21, at 1. It is not, as was the case in Cary, the entirety of their land and infrastructure. Cf. 552 F.3d at 1380. Thus, while "the fire [here] has come and gone" and the land might once again be put to use, part two of the Ridge Line inquiry is also satisfied because the fires the IMT lit permanently preempted the Ranches' rights to enjoy their timber and range forage.

In short, the government's argument that the Ranches' claims sound in tort lacks merit. The Court therefore finds that it has jurisdiction over those claims under the Tucker Act.

C.  **Causation**

The government's third argument is that it is entitled to summary judgment because the Ranches have not produced evidence sufficient to establish that the damage to their range and

timber would not have occurred if firefighters had not conducted firing operations on their property during the response to the Alice Creek Fire. See Def.'s Mot. at 20–23. The Court concludes, however, that the parties' positions regarding proof of causation should be presented at trial and not resolved in the context of summary judgment proceedings. See Arkansas Game & Fish Comm'n v. United States, 568 U.S. 23, 32 (2012) (observing that "most takings claims turn on situation-specific factual inquiries"); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (noting that "summary judgment should not be granted precipitously" in cases where the plaintiff asserts a takings claim (citing Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983))).

"It is well established that a takings plaintiff bears the burden of proof to establish that the government action caused the injury." St. Bernard Par. Gov't v. United States, 887 F.3d 1354, 1362 (Fed. Cir. 2018). It is also well established that, in a takings case, proof of "[c]ausation requires a showing of 'what would have occurred' if the government had not acted" at all. Id. (quoting United States v. Archer, 241 U.S. 119, 132 (1916)); see also Bd. of Supervisors v. United States, 84 F.4th 1359, 1368 (Fed. Cir. 2023) (explaining that there is no physical or regulatory takings liability "without a showing of 'what would have occurred if the government had not acted'" (quoting St. Bernard Parish, 887 F.3d at 1362)); Caquelin v. United States, 959 F.3d 1360, 1371 (Fed. Cir. 2020). Therefore, "to establish causation" in a takings case, "a plaintiff must show that in the ordinary course of events, absent government action, [they] would not have suffered the injury." St. Bernard Parish, 887 F.3d at 1362.

The government argues that the Ranches cannot meet their burden of proving causation because their fire behavior expert, Darrell Schulte, was not asked to and did not compare the damage caused by the firefighting response to the Alice Creek Fire to the damage that would have occurred in the absence of that response. Def.'s Mot. at 21–22. It contends that the Ranches have adduced evidence "limited to a series of maps that merely illustrate the actual progression of the Alice Creek Fire with the fire suppression activities," which "do not permit a reasonable inference of what the Fire would have done absent those actions." Def.'s Reply at 19. In contrast, the government notes that its expert, Brenda Wilmore, employed models to predict or estimate the movement and intensity of the wildfire in the absence of the firing operations. Def.'s Mot. at 22 (citing Def.'s Mot. Ex. 23, at 1–14, 27–55, ECF No. 46-23 [hereinafter Wilmore Report]; Def.'s Mot. Ex. 24, at 6–18, ECF No. 46-24). And based on these models, she concluded that the damage to the Ranches' property would have occurred even absent the firing operations. See Def.'s Mot. at 23 (citing Wilmore Rep. at 55); see also Wilmore Rep. at 26, 40, 47.

The Ranches respond that the undisputed evidence shows that the IMT purposely chose to burn their range forage and timber as backfire fuel. See Pls.' Resp. to Def.'s Mot. for Summ J. at 21, ECF No. 49 [hereinafter Pls.' Resp.] (quoting Am. Compl. ¶ 12; Am. Answer ¶ 12). They contend that this is sufficient in and of itself to establish causation. Id. at 28–29. They further argue that because they allege a per se physical taking, they are not required to satisfy the but-for standard of causation set forth in St. Bernard Parish and related circuit precedent. Id. at 35–36.

The Ranches provide no persuasive basis for carving out an exception to the but-for standard of causation for per se physical takings. Therefore, to prevail in this case, they will have to show by preponderant evidence that—absent the firing operations and other suppression efforts undertaken by the government—their property would not have been taken. St. Bernard Parish, 887 F.3d at 1362 (quoting Archer, 241 U.S. at 132)).

11

Nevertheless, the Court is not persuaded that the Ranches have failed to identify sufficient evidence to meet their burden of proof as a matter of law. There is at least some evidence in the record that suggests that "the fire that spread across the [R]anches was not the natural fire." See Pls.' Resp. at 34. This evidence includes the Forest Service's fire progression maps, as well as a series of infrared maps, which the Ranches contend show that "the burning on the east flank of the fire, [in the direction of the Ranches,] . . . was the result of days of sustained planned ignitions" by the IMT. See id. at 34–35; see also Pls.' Resp. Ex. K, ECF No. 49-11; Pls.' Resp. Ex. L, ECF No. 49-12 [hereinafter Fire Progression Maps]. According to the Ranches, this evidence indicates that the wildfire had "ceased growing to the east" by the time the "planned ignitions began in earnest." Pls.' Resp. at 34 (citing Fire Progression Maps at L15). As such, the Ranches contend—absent the firing operations conducted by the IMT—the Alice Creek Fire would not have consumed the Ranches' range forage and timber. See id. (citing Fire Progression Maps at L15).

The government responds that Ms. Wilmore's models prove that, even had the government not conducted firing operations, the Ranches' property would have been burned in the wildfire. Def.'s Mot. at 23. It also contends that the maps upon which the Ranches rely illustrate the actual progression of the fire with the fire suppression activities, so they have little value in determining what would have happened had the government not engaged in fire suppression activities. See Def.'s Reply at 19–20; see also Def.'s Mot. at 23 (citing Def.'s Mot. Ex. 14, at 172:17–173:3, ECF No. 46-14 [hereinafter Schulte Dep.]). The Ranches' expert, Mr. Schulte, however, challenged the accuracy of the models upon which Ms. Wilmore relied. See Schulte Dep. at 153:2–21, 154:18–157:1, 171:19–172:7.

The Court is hesitant to determine whether the government's challenges to the probative value of the maps upon which the Ranches rely are well-taken based only on a paper record. See George Fam. Tr. ex rel. George v. United States, 97 Fed. Cl. 625 (2011) (observing that "the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter" on a motion for summary judgment (citing Liberty Lobby, 477 U.S. at 255)). Therefore, the government's motion for summary judgment as to causation will be denied.

## CONCLUSION

For the foregoing reasons, the government's RCFC 56(a) motion for summary judgment, ECF No. 46, is **DENIED**.

The parties shall file a joint proposed pretrial scheduling order by July 26, 2024. The schedule will propose dates for the exchanges required by RCFC, Appendix A ("App. A"), ¶ 13, the filings required by App. A, ¶¶ 14–18, and the pretrial conference, as well as dates for trial between September 30–October 18, 2024, or December 2–13, 2024. Unless the parties suggest otherwise, the Court's intention is that the trial will be held at the United States District Court for the District of Montana, Paul G. Hatfield Federal Courthouse, 901 Front Street, Helena, MT 59626.

**IT IS SO ORDERED.**

                                                    s/ Elaine D. Kaplan
                                                    ELAINE D. KAPLAN
                                                    Chief Judge